# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**KIM E. FERRARO**
Hoosier Environmental Council
Valparaiso, Indiana

ATTORNEYS FOR APPELLEES:
Attorneys for Ind. Dept. of Environmental
Management
**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana

Attorneys for Central Indiana Ethanol, Inc.
**ANTHONY C. SULLIVAN**
**E. SEAN GRIGGS**
**MARK J. CRANDLEY**
**TIMOTHY A. HALEY**
Barnes & Thornburg
Indianapolis, Indiana

Attorneys for Andersons Clymers Ethanol, LLC
**JOHN E. HALLER**
Shumaker, Loop & Kendrick, LLP
Columbus, Ohio

**LOUIS E. TOSI**
**JOSEPH S. SIMPSON**
Shumaker, Loop & Kendrick, LLP
Toledo, Ohio

Attorneys for Green Plans Bluffton, LLC
**VICKI J. WRIGHT**
**BRYAN S. STRAWBRIDGE**
Krieg DeVault LLP
Indianapolis, Indiana

Attorneys for Poet Biorefining-North
Manchester, LLC and Poet Biorefining-
Cloverdale
**TERRI A. CZAJKA**
Ice Miller LLP
Indianapolis, Indiana

FILED
Apr 30 2013, 9:12 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

_____

NATURAL RESOURCES DEFENSE COUNCIL,  )
    )
    Appellant-Respondent,  )
    )
      vs.  )     No. 49A02-1205-MI-423
    )
POET BIOREFINING-NORTH MANCHESTER,  )
LLC, POET BIOREFINING-CLOVERDALE,  )
LLC, CENTRAL INDIANA ETHANOL, INC.,  )
and INDIANA DEPARTMENT OF  )
ENVIRONMENTAL MANAGEMENT,  )
    )
    Appellees-Petitioners,  )
    )
GREEN PLAINS BLUFFTON, LLC, and  )
ANDERSON CLYMERS ETHANOL, LLC,  )
    )
    Appellees-Intervenors.  )

---

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Certo, Judge
The Honorable Valerie Horvath, Commissioner
Cause Nos. 49F12-1102-MI-5363, 49F12-1102-MI-5373, 49F12-1102-MI-5298

---

**April 30, 2013**

**OPINION - FOR PUBLICATION**

**MAY, Judge**

In 2010 the Indiana Department of Environmental Management (IDEM) issued

permits to some fuel-grade ethanol production facilities. The permits did not categorize the

facilities as "chemical process plants", as such facilities had been categorized in the past.

Facilities identified as "chemical process plants" are permitted to emit only 100 tons of certain air pollutants per year, while facilities not so identified may emit up to 250 tons of certain air pollutants per year.

The Natural Resources Defense Council (NRDC) challenged IDEM's classification of the ethanol production facilities outside the category of "chemical process plants," and IDEM's Office of Environmental Adjudication (OEA) determined the facilities should have been categorized as "chemical process plants." The facilities appealed to the Marion Superior Court, which reversed the OEA's determination such that the plants again were excluded from the category of "chemical process plants."

The issue before us is whether the State could properly exclude fuel-grade ethanol production plants from the category of "chemical process plants" without Environmental Protection Agency (EPA) approval of a modification to the Indiana State Implementation Plan (SIP). As it could not, the ethanol plants remain "chemical process plants," and we must reverse the trial court.[1]

---

[1] The appellees also argued before the trial court that it should have stayed this action pending a decision by the Circuit Court of the District of Columbia on a challenge to a 2007 EPA rule that excluded fuel-grade ethanol production plants from the "chemical process plant" category. As Indiana's failure to modify its own SIP to exclude fuel ethanol plants from the more strict pollution limits is determinative of the result herein, we need not stay this action.

One Appellee, Green Plains Bluffton, argues NRDC does not have standing to bring this action. The OEA found NRDC had "associational standing" to sue on behalf of its members. (App. at 18.) Green Plains does not challenge that OEA determination, and the trial court did not address standing. Green Plains now argues NRDC is alleging the permits do not comply with the SIP, and it asserts "the sole remedy is under 42 U.S.C. § 7509" and only the EPA may make such a challenge. (Br. of Appellee Green Plains Bluffton, LLC at 14.) 42 U.S.C. § 7509 addresses sanctions the EPA may impose on states that have not submitted or implemented plans to address areas designated as "nonattainment." As the case before us does not involve "sanctions" or "nonattainment areas," we decline to hold NRDC lacks standing.

**FACTS AND PROCEDURAL HISTORY**

The Clean Air Act creates a comprehensive scheme for controlling air quality through federal and state regulation. Congress and the EPA set national minimum air-quality standards, but the states have primary responsibility for assuring air quality. The states accomplish this task by promulgating regulations in the form of the SIP. Each state's SIP must set air-quality standards that are at least as stringent as those established by the Clean Air Act and its implementing regulations. The SIP becomes federal law once the EPA approves it,[2] and it cannot be changed unless and until the EPA approves any change. *Safe Air for Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1097 (9th Cir. 2007). Consequently, a state's interpretation of the regulations incorporated into the SIP, even if binding as a matter of state law, is not directly dispositive of the meaning of the SIP under federal law. Federal law does not prevent a state from having a broader or more stringent regulatory program than is required by federal law.[3] *See Ind. Dept. of Envtl. Mgmt. v. Twin Eagle LLC*, 798 N.E.2d 839, 842 (Ind. 2003) (addressing Clean Water Act).

One part of the Clean Air Act that works through the SIPs is the prevention-of-significant-deterioration (PSD) program, which seeks to prevent significant deterioration of

---

[2]  The trial court found, among other things: "The Indiana legislature made its intent clear" when it amended the Indiana Code to exclude fuel ethanol plants. (App. at 11.) As the Indiana SIP became *federal* law when the EPA approved it, the significance of any expression of "intent" by the Indiana legislature is not apparent.

[3]  The trial court's decision appears to be premised in part on its determination that because the EPA decided in 2007 to exclude ethanol plants from the more stringent pollution limitations applicable to chemical process plants, the "legislative intent regarding the definition of 'chemical process plant' was made clear when the EPA issued its Final Rule." (App. at 11.) As Federal law does not prevent a state from having a broader or more stringent regulatory program, we decline to find a change in the EPA rule, without more, indicates a "legislative intent" that Indiana's regulation become less stringent.

air quality in certain areas. 42 U.S.C. § 7470-79. The ethanol plants at issue in the case before us are located in such areas. The PSD program applies to "major emitting facilities," and the definition of "major emitting facility" for PSD purposes includes "chemical process plants." 42 U.S.C. § 7479. A "major emitting facility" is a stationary source of air pollutants that emits, or has the potential to emit, one hundred tons per year or more of any air pollutant from certain types of stationary sources, including chemical process plants. *Id.* Such facilities have two emission thresholds. If a facility falls within one of twenty-eight listed "industrial categories," it is subject to the 100 ton-per year emissions limit. One of those categories is "chemical process plant." *Id.* If it is outside one of those listed industrial categories, it may emit pollutants at a 250 ton-per-year limit. *Id.*

The Indiana SIP provides that federal PSD regulations and Indiana Air Pollution Control Board rules are incorporated by reference. The SIP has been in effect in its current form[4] since 2001, and the 2001 version of the Indiana SIP was the last one to be approved by the EPA.

A SIP is to provide for revision "as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard." 42 U.S.C. § 7410. But modifications or revisions are not effective unless approved by the EPA. *Sierra Club v. Indiana-Kentucky Elec. Corp.*, 716 F.2d 1145, 1152 (7th Cir. 1983).

Pollutant-emitting activities are classified by "industrial groupings." Activities are

---

[4] There have been minor revisions not relevant to this case.

"considered as part of the same industrial grouping if they belong to the same major group, for example, that have the same first two (2) digit code, as described in the Standard Industrial Classification Manual, 1972, as amended by the 1977 Supplement (U.S. Government Printing Office)." 326 Ind. Admin. Code 2-2-1(j). Fuel ethanol plants are, for purposes of the Indiana SIP, "chemical process plants" because they are within that industrial grouping. Specifically, at the time the Indiana SIP was approved, fuel ethanol plants were included in Major Group 28 as "Industrial Organic Chemicals, Not Elsewhere Classified." (App. at 54-55.) Included in that subcategory was "Ethanol, industrial." (*Id*. at 55.)

In 2007, the EPA promulgated a final rule that excluded fuel ethanol plants from the definition of "chemical process plant." 72 Fed. Reg. 24059. In its 2006 proposal to amend the rule that resulted in the 2007 final rule, the EPA noted:

> [O]ne of the source categories in the list of 28 source categories included in the "major emitting facility" definition (and in the NSR and title V regulations) is chemical process plants. The major group SIC [Standard Industrial Classification] code (2-digit SIC code) in which chemical process plants falls is major group 28 -- "Chemicals and Allied Products." The 4-digit SIC code which is directly applicable to the production of ethanol for fuel is SIC code 2869—"Industrial Organic Chemicals, Not Elsewhere Classified." "Ethanol, industrial" and "Ethyl alcohol, industrial (nonbeverage)" are both listed in the SIC Manual as a specific product within this 4-digit category.

71 Fed. Reg. 12240-01 (footnote omitted). The EPA went on to note that "[g]iven that ethanol fuel production is specifically listed under the 2-digit 'Major Group' SIC code of 28 in the SIC manual . . . [the] EPA has historically required production facilities or units which produce ethanol fuel to be classified as chemical process plants . . . subject to the 100 tons per year threshold under PSD." *Id*. at 12244.

6

The trial court found that, before 2007, the EPA and IDEM "consistently licensed fuel ethanol plants as 'chemical process plants' subject to [the 100 tons-per-year emissions limit]." (App. at 9.) In 2007, the EPA issued a final rule that provided facilities that produce ethanol fuel would be excluded from the definition of "chemical process plants" so such plants could emit pollutants at the higher level. 72 Fed. Reg. 24060-01 (May 1, 2007). In 2011, IDEM issued a "nonrule policy document" that noted the 2007 EPA rule change and stated its position that ethanol plants were not "chemical process plants." http://www.in.gov/idem/files/nrpd-air_035.pdf (last visited March 13, 2013).

The Indiana legislature passed a law providing ethanol plants were not "chemical process plants":

> For purposes of rules adopted by the board, a reference to "chemical process plants" does not include an ethanol production operation that:
> (1) produces ethanol by natural fermentation after July 2, 2007; and
> (2) is included in the North American Industry Classification System (NAICS) code:
>      (A) 325193 (Ethyl Alcohol Manufacturing); or
>      (B) 312140 (Distilleries);
> as described in 72 FR 24059 et seq. (May 1, 2007).

Ind. Code § 13-17-3-4(e). IDEM promulgated a rule to the same effect.

> (ff) "Major stationary source" means the following:
>      (1) Any of the following stationary sources of air pollutants that are located or proposed to be located in an attainment or unclassifiable area as designated in 326 IAC 1-4 and that emit or have the potential to emit one hundred (100) tons per year or more of any regulated NSR pollutant:
>           * * * * *
>           (U) Chemical process plants, excluding ethanol production facilities that produce ethanol by natural fermentation included in North American Industry Classification System (NAICS)

7

codes 325193 for Ethyl Alcohol Manufacturing or 312140 for Distilleries, as revised in 2007.

326 Ind. Admin. Code 2-2-1(ff)(1)(U). But the Indiana SIP, through which the state implements the federal Clean Air Act, was never modified, such that the modified version could be approved by the EPA.

The EPA apparently contemplated that states would want to follow suit and change their SIPs accordingly: "we encourage such State, local and tribal authorities in such areas to make such SIP or title V program changes in the future to enhance the clarity of the existing rules." 72 Fed. Reg. 24074-75. However, it also noted "it may not be necessary for a State . . . to revise its SIP or Title V programs to begin to implement these changes." *Id*. at 24074. Some authorities, the EPA said, "may be able to adopt these changes through a change in the interpretation of the term "chemical process plant" without the need to revise the SIP." *Id*. at 24074. The EPA did not specify which authorities could adopt the changes through "interpretation."

NRDC challenged certain permits IDEM issued that did not subject the ethanol plants to the 100 ton per year limit. The OEA determined IDEM had improperly categorized the facilities. As the facilities were chemical process plants, the OEA held, the fuel ethanol plants should have been subject to the lower pollution limits.

IDEM and certain ethanol plant operators appealed and the Marion Superior Court reversed the OEA. The court found the EPA approved a 2003 amendment to the Indiana SIP that incorporated the Indiana PSD program, but IDEM had not submitted a formal request to

8

EPA to amend the PSD program. It noted the term "chemical process plant" had been a part of the Indiana PSD rules since 1980. The term had been subject to multiple interpretations by federal and state agencies that administered the program, but before 2007, both the EPA and IDEM had "consistently licensed fuel ethanol plants as 'chemical process plants' subject to" the 100 ton-per-year limit. (App. at 9.) The court noted the 2007 EPA rule that excluded fuel ethanol plants from the category of chemical process plants, but found no amendment to the Indiana SIP was submitted to or approved by the EPA. Nonetheless, the trial court found "the Indiana legislature made its intent clear when it amended Indiana statute to specifically exclude ethanol production plants from the definition of 'chemical process plant' in Ind. Code § 13-14-3-4(3),"[5] (*Id*. at 11), and IDEM amended the Indiana Administrative Code to the same effect. The trial court characterized the EPA rule and the Indiana actions as "clarifications," (*Id*. at 11), of the definition[6] of "chemical process plant," and reversed the OEA based on what it characterized as those expressions of "legislative intent." (*Id*.)

---

[5] We find no "definition" of "chemical process plant" in the Indiana Code, nor do we find any such section in the Code. The trial court may have been referring to Ind. Code § 13-17-3-4(e), which provided:

> For purposes of rules adopted by the board, a reference to "chemical process plants" does not include an ethanol production operation that:
> (1) produces ethanol by natural fermentation after July 2, 2007; and
> (2) is included in the North American Industry Classification System (NAICS) code:
> (A) 325193 (Ethyl Alcohol Manufacturing); or
> (B) 312140 (Distilleries)[.]

[6] While the trial court found the legislative and administrative actions clarified that "definition," it also noted "[t]there is not a universally accepted definition of chemical process." (App. at 8 n.3.)

9

**DISCUSSION AND DECISION**

The Administrative Orders and Procedures Act (AOPA) limits judicial review of agency action. Agency action subject to AOPA will be reversed only if a person seeking judicial relief has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806, 809 (Ind. 2004) (citing Ind. Code § 4-21.5-5-14). We give deference to an administrative agency's findings of fact, if supported by substantial evidence, but review questions of law *de novo. Id.*

The trial court acknowledged IDEM submitted no request to amend its SIP, and the EPA has approved no such change. But the court characterized the EPA's action changing the categorization of ethanol plants as a "clarification made by subsequent changes to EPA rule," (App. at 11), and it found the "Indiana legislature made its intent clear" when it amended the Indiana Code to the same effect. As the EPA rule change was more than a mere "clarification," Indiana was obliged to seek approval of an amendment to its SIP. Because it did not, the OEA was correct that the facilities were chemical process plants pursuant to the Indiana SIP and permits allowing pollutant emissions at the 250 ton-per-year level should not have been issued absent an EPA-approved change in the Indiana SIP.

In its 2007 Final Rule excluding ethanol plants from the category of chemical process

10

plants, the EPA was explicit that its action followed from its proposal "to change the definition of 'chemical process plants'" to exclude fuel ethanol facilities. 71 Fed. Reg. at 24062. The EPA could not have so "changed the definition" to that effect had fuel ethanol plants not previously been considered "chemical process plants." As the Indiana SIP was not amended to similarly change the definition of chemical process plants, fuel ethanol plants in Indiana remain in that category.

Further, as stated above, the EPA explicitly contemplated its 2007 definitional change would implicate state SIPs. In its final rule, the EPA said "we encourage such State, local and tribal authorities in such areas to make such SIP or title V program changes in the future to enhance the clarity of the existing rules."[7] Id. at 24075. As Indiana never submitted and the EPA never approved an amendment to the Indiana SIP that would change the definition of "chemical process plants" to remove fuel ethanol plants from the 100 ton-per-year pollution limit, the OEA correctly determined the permits at issue should not have been granted.

Even if the failure to amend Indiana SIP could be disregarded, as the appellees suggest, IDEM's past consistent treatment of fuel ethanol plants as chemical process plants would dictate the result we reach. Once an agency gives its regulation an interpretation, as has IDEM by consistently treating fuel ethanol facilities as chemical process plants in its

---

[7] We acknowledge EPA's statement some state authorities "may be able to adopt these changes through a change in the interpretation of the term "chemical process plant" without the need to revise the SIP." 71 Fed Reg. at 24074. EPA did not specify which authorities could adopt the changes through "interpretation," and we are directed to nothing in the record that indicates Indiana would have such authority.

11

permitting decisions prior to 2007, it can change that interpretation only "as it would formally

modify the regulation itself: through the process of notice and comment rulemaking."[8]

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997), *cert.*

*denied sub nom. Pollin v. Paralyzed Veterans of America*, 523 U.S. 1003 (1998).  That court

noted:

> Under the [Administrative Procedures Act (APA)], agencies are obliged to engage in notice and comment before formulating regulations, which applies as well to "*repeals*" or "*amendments.*"  *See* 5 U.S.C. § 551(5).  To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements.  That is surely why the Supreme Court has noted (in dicta) that APA rulemaking is required where an interpretation "adopt[s] a new position inconsistent with . . . existing regulations.

*Id.  And see Alaska Prof'l Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030, 1031 (D.C. Cir.

1999).

In *Alaska Professional Hunters Association*, beginning in 1963, the Federal Aviation

Administration, through its Alaskan Region, consistently advised guide pilots that they were

not governed by regulations dealing with commercial pilots.  "FAA personnel in Alaska

consistently followed the interpretation in official advice to guides and guide services."  *Id.*

At some point the FAA published a "Notice to Operators" in the Federal Register stating

Alaskan guides who transport customers by aircraft to and from sites where they provide

guiding services, with transportation included in the package price of the trip, henceforth

must comply with those regulations for commercial pilots.  *Id*. at 1033.

---

[8]  We acknowledge IDEM did promulgate a new rule excluding fuel ethanol plants.  But as explained above, that was not enough – EPA approval of an amended SIP was required.

The Alaska Professional Hunters Association argued the Notice to Operators altered the FAA's well-established interpretation of its regulations and should have been promulgated pursuant to notice and comment rule making. The FAA argued the Notice to Operators was "merely an interpretative rule," exempt from the notice and comment requirements of the APA. *Id.* The court rejected that argument, stating "when an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Id*. at 1034.

Because IDEM had, in its prior permitting decisions, given the term "chemical process plant" a "definitive interpretation, and later significantly revise[d] that interpretation," it was obliged to seek EPA approval for an amended SIP. *See id.* We accordingly reverse the trial court.

Reversed.

ROBB, C.J., and PYLE, J., concur.